Max R. Casciani and Mildred M. Casciani v. Commissioner.
Casciani v. Commissioner
Docket No. 4823-63.
United States Tax Court
T.C. Memo 1967-203; 1967 Tax Ct. Memo LEXIS 59; 26 T.C.M. (CCH) 997; T.C.M. (RIA) 67203; October 16, 1967
*59 Upon the facts, held: (1) That the assessment and collection of a deficiency for each taxable year 1950 through 1955 are not barred by the statute of limitations, because for each year the petitioners filed a false and fraudulent return with intent to evade tax. (2) The petitioners realized a substantial amount of income in each of the 6 taxable years which they failed to report. With the exception of several adjustments by the Court, respondent's determinations that petitioners realized but failed to report income for each year are sustained. (3) Part of the deficiencies were due to fraud with intent to evade tax; therefore, the 50 percent penalties under sections 293(b), 1954 Code, and 6653(b), 1954 Code are sustained. (4) The additions to tax for 1950 and 1951 under section 294(d)(1)(A), 1939 Code, are sustained. (5) The additions to taxes for 1952, 1953, and 1954 under section 294(d)(2), 1939 Code, are not sustained. L. Robert Leisner, Rand Bldg., Buffalo, N. Y., for the petitioners. Paul H. Frankel and Richard J. Grassgreen, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: For the years 1950 through 1955, the respondent determined income tax *60 deficiencies, and additions to the taxes and the deficiencies under sections 293(b), 294(d)(1)(A), and 294(d)(2) of the 1939 Code, and section 6653(b) of the 1954 Code, as follows: Sec. 293(b)
Section
Section
Year
Deficiency
Sec. 6653(b)
294(d)(1)(A)
294(d)(2)
1950
$2,142.10
$1,071.05
$207.62
1951
1,159.33
579.67
109.12
1952
2,408.18
1,204.09
$150.74
1953
3,906.21
1,953.11
223.24
1954
3,142.61
1,571.31
187.45
1955
2,035.22
1,017.61
The questions are: (1) Whether petitioners filed false or fraudulent returns with intent to evade taxes for each of the taxable years, so that there is no bar of the statute of limitations to the assessment and collection of the deficiencies. (2) Related to the above is the question whether petitioners received income, which they failed to report on their returns, in the following amounts (or in lesser amounts) of $11,098.34 in 1950; $6,008.21 in 1951; $10,232.06 in 1952; $14,804.55 in 1953; $13,474.45 in 1954; and $8,664.83 in 1955. (3) Whether part of the deficiency for each year, if any, is due to fraud with intent to evade tax, so that a 50 percent addition to each deficiency shall be imposed for fraud under section 293(b), 1939 Code, and section 6653(b), 1954 Code. (4) Whether petitioners *61 are liable for additions to the taxes for 1950 and 1951 under section 294(d)(1)(A). (5) Whether the petitioners are liable for additions to the taxes for 1952, 1953, and 1954 under section 294(d)(2), 1939 Code. Findings of Fact The stipulated facts are found as stipulated; the stipulations of facts are incorporated herein by reference. Petitioners are residents of Buffalo. They filed joint returns for each of the taxable years with the district director of internal revenue in Buffalo, New York. The returns were filed on the cash and calendar year basis. Petitioners are referred to hereinafter as Max and Mildred. Max, who was born in Italy on January 3, 1902, came to the United States in 1921. From 1921 to 1935, he was employed by various firms in Detroit, and he worked at metal finishing and cement finishing. He had some bank accounts in Detroit. He moved to the area of Buffalo after 1935 and worked for various firms there until 1948 doing metal finishing and cement finishing. He has always had bank accounts in Buffalo. Mildred was born on September 15, 1911, in Oakfield, New York, and attended Cortland Normal School. She received a teacher's certificate from that school in 1935, and *62 from 1935 to 1939 she was employed as a school teacher in Pembrook, New York. The petitioners were married in 1938, and have 2 children; John, who was born in 1940; and Bonnie, who born in 1945. During World War II, Mildred worked at a Chevrolet plant in Buffalo. During 1946, she operated a business known as "Mildred's Variety Shop" at 2236 Fillmore Avenue, Buffalo. This business was not successful and was discontinued. Max's wages before 1948 were about $1.60 an hour. When he worked in Detroit, his earnings were less. Prior to his marriage, he continuously sent his extra money to his parents in Italy. Mildred's wages at the Chevrolet plant were $1.10 an hour. After their marriage, Max continued to send money to his parents on holidays, but he did not send money as often as he had done before his marriage because he needed most of his earnings for the living expenses of his family. In 1945, Max and Mildred bought the property at 2236 Fillmore Avenue, Buffalo, and lived there. In 1948 and thereafter, Max worked exclusively in his own cement finishing business in Buffalo, which he conducted under the name of Casciani Concrete Construction. This business was a sole proprietorship; it *63 consisted principally of the construction of concrete flat work, such as sidewalks, driveways, and cellars. Max carried on his business through the year 1955. During the busy season of the business, April through October, during the years 1950 through 1955, Max employed 3 or 4 men each year on various jobs. All of the record keeping for Max's business was done by Mildred. During the years 1950 through 1955, she kept single entry records in a notebook for the Casciani concrete business. Each year, during the winter, Mildred prepared tablet sheets listing items of income and expenses of the Casciani concrete business for the previous year. She gave these tablet sheets to Carl L. Bauer, a public accountant, who used the data thereon in preparing the petitioners' income tax returns for each of the years 1950 through 1955. Bauer did not make an audit of the petitioners' books and records, or of any records of the Casciani concrete business, during any of those years. Bauer is now deceased; he died before the trial of this case. The returns filed by the petitioners for the years 1950 through 1955 reported total receipts, and purchases of materials and supplies for the Casciani concrete business, *64 as follows: Per Tax Re-
Per Tax Re-
turns, Total
turns, Materials
Year
Receipts
and Supplies
1950
$20,977.58
$8,916.00
1951
17,156.85
6,405.45
1952
19,242.90
7,281.14
1953
18,299.42
6,378.92
1954
19,802.63
6,924.79
1955
25,142.58
8,413.35
In 1955, a revenue agent, Edward J. Widzinski, was assigned the petitioners' 1954 return for a field examination, and in December, 1955, he telephoned Max and told him that the 1954 return was being audited. At one time, Mildred kept accurate and complete records in notebooks of all of the receipts of the Casciani concrete business, and of all of the expenditures for materials and expenses. She maintained these notebooks of the complete and accurate records of the business for each of the years 1950 through 1955. In February, 1956, Mildred destroyed the "accurate" notebook of records for 1953, 1954, and 1955, which was soon after Widzinski had notified Max that their 1954 return was being audited, and just before Mildred entered a hospital. She and Max were questioned later, by revenue agents, Murray and Widzinski, on November 30, 1956, and later, in December, 1957, by another revenue agent, George Montz. Mildred destroyed the above "accurate" records of the business because *65 she feared that it would be found out that all of the business income had not been reported in their tax returns. At some time, Mildred also destroyed the "accurate" notebook containing the records of the business receipts, costs, and expenses for 1950, 1951, and 1952. Widzinski began his audit of petitioners' 1954 return, following his field examination, in April 1956, and in April he met with Carl Bauer, the accountant, who then submitted a notebook, which he had received from Mildred, containing records of business receipts and expenses for 1953, 1954, and 1955, of the Casciani concrete business. Bauer had not seen that notebook before April, 1956. When Widzinski compared the figures in this notebook with the figures on petitioners' returns for 1953 through 1955, he found both sets of figures substantially the same. Bauer also submitted to Widzinski the tablet work sheets which he had used in preparing the returns for the years involved here. Being temporarily satisfied that the amount of the income reported by the petitioners for 1954 was correct since the reported amount of income was supported by the notebook, Widzinski then began checking the deductions taken on the 1954 return. *66 Except for the concrete purchases, the deductions seemed to be substantially correct, as reported. Widzinski then inspected the records of Max's suppliers to verify the amounts reported in the return as the purported costs of the purchases of concrete. The records of the suppliers revealed that the actual purchases of concrete were much higher than the amounts shown in the tax returns. The amounts shown on the petitioners' returns for 1950 through 1955, as the purchases of concrete and materials, supra, and the amounts of the actual purchases, discovered by Widzinski, were as follows: Actual Pur-
Purchases
chases Per
Years
Per Returns
Widzinski
Difference
1950
$8,916.00
$14,000.00
$5,084.00
1951
6,405.45
14,000.00
7,594.55
1952
7,281.14
15,000.00
7,718.86
1953
6,378.92
20,138.93
13,760.01
1954
6,924.79
16,027.76
9,102.97
1955
8,413.35
16,838.81
8,425.46
Having ascertained that Max had claimed deductions in lower amounts than apparently he was entitled to deduct, Widzinski then obtained from the records of the suppliers the invoices for the purchases. The concrete used by Max was ordered in ready mixed form and was delivered directly to each job location by the supplier. Due to this procedure of the suppliers, Widzinski *67 was able to get the addresses, to which the deliveries of concrete had been made, from the invoices of the suppliers. He then contacted the owners of the properties at those addresses; he learned that Max had done work for them; and that they had paid Max for the work. Widzinski then compared this data with the submitted notebook (which is exhibit AA), and found that all of the receipts from customers were not shown in the notebook. Widzinski made an analysis of the ratio of the cost of the concrete purchased by Max, to the payments Max had received from his customers; and Widzinski then ascertained that payments received were about 3 times as much as the cost of concrete. In July 1956, a special agent, Robert H. Murray, was assigned to work with Widzinski. On November 30, 1956, Max and Mildred were questioned, under oath, by Murray and Widzinski. Max admitted that he did not always make an invoice or written contract for each construction job. He estimated that the largest amount of his cash on hand during the prior 5 or 6 years, back to December 31, 1950, was $17,000 or $18,000, including $15,000 which he claimed he had brought back from Italy during 1950, as his share of his deceased *68 father's estate. He told the agents that he and his family had only 3 savings accounts. In Mildred's statements to the agents, she estimated that the family's annual living expenses were about $3,000 per year; and she told the agents that the most of their cash on hand during the last 5 years had been about $15,000 or $16,000, including $15,000 brought back from Italy, and what was in the box in her bedroom. She admitted that she must have destroyed the notebook record for 1950, 1951, and 1952; and she stated that the notebook for 1953, 1954, and 1955, submitted by Bauer (exhibit AA), was the record she had kept for the concrete business. In December 1956, Max told Widzinski that he, Max, knew his income was considerably higher than had been reported. The investigation of petitioners' income tax returns was extended to cover the years 1950 through 1955. On December 2, 1957, Max and Mildred met with George C. Montz, Murray's supervisor, and with Murray. Max and Mildred, each, were placed under oath, were advised of their Constitutional rights, and were told that criminal prosecution was contemplated. Max told Montz and Murray that he, Max, knew his earnings were greater than reported *69 on his returns. Mildred admitted that she knew that all of their receipts were not recorded in the notebook record (exhibit AA in this case) which she had given to the agents, and, also, that she knew that all of their receipts had not been reported on their returns. Mildred also admitted that she had kept a separate record showing the complete details of their receipts and of all the purchases for 1953, 1954, and 1955, and that she had destroyed this accurate notebook because she was afraid that somebody would find out they had not reported all of their receipts. Mildred said she did not report all of their income because she needed the money for her children and for her household. On February 3, 1960, Max and Mildred were indicted in the United States District Court for the Western District of New York in Buffalo on charges of willfully and knowingly attempting to evade and defeat a large part of their income taxes for 1953, 1954, and 1955. On March 30, 1962, Max and Mildred, each, pleaded guilty to Count II of the indictment relating to 1954, in which they were charged, as follows: That on or about the 8th day of April 1955, in the Western District of New York, the defendants Max *70 R. Casciani and Mildred M. Casciani, who during the calendar year 1954 were married, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by them for the calendar year 1954 by filing and causing to be filed with the District Director of Internal Revenue for the Buffalo District, a false and fraudulent joint income tax return on behalf of themselves, wherein it was stated that their taxable income for said calendar year was the sum of $526.38 and that the amount of tax due and owing thereon was the sum of $105.28, whereas, as they then and there well knew their joint taxable income for said calendar year was the sum of $13,695.71, upon which said taxable income there was owing to the United States of America an income tax of $3,228.72; in violation of Section 7201, Internal Revenue Code; 26 U.S.C. Section 7201. On April 10, 1962, Mildred was fined $1,000, and Max was fined $1,000; Max was given a suspended sentence of 18 months in prison and placed on probation for 18 months. The fines were paid; the time for appeal has expired. Respondent, by statutory notice of deficiencies, mailed July 17, 1963, determined that deficiencies in income *71 tax, and additions to the deficiencies and to the taxes were due from the petitioners in the amounts hereinabove set forth. Respondent determined that the petitioners realized additional adjusted gross income, which they failed to report, for each year under the net worth plus personal expenditures method in the amounts of $11,098.34 for 1950, $6,008.21 for 1951, and $10,232.06 for 1952. The Commissioner's determinations of additional unreported income for 1950, 1951, and 1952, were based upon the net worth plus expenditures method because the petitioners' records for those years were not adequate and complete. The net worth plus expenditures schedule of the respondent is as follows: Net Worth Increases Plus Expenditures
1949
1950
1951
1952
Cash on hand not in banks
0
$15,000.00
0
0
Cash in banks
$14,985.35
22,521.12
$25,774.28
$18,907.12
U.S. Savings bonds
937.50
3,187.50
3,187.50
3,187.50
Personal residence
0
0
14,071.58
25,021.42
Furniture
0
0
0
5,721.51
Land - residence
0
0
2,318.98
2,318.98
Rental real estate
8,000.00
8,350.00
8,900.00
8,900.00
Less: Reserve for depreciation
(378.00)
(504.00)
(655.67)
(1,031.17)
Business equipment
$ 1,673.50
$ 3,246.17
$ 3,246.17
$ 3,246.17
Less: Reserve for depreciation
(414.58)
(319.03)
(889.70)
(1,470.37)
Subdivision Lots 640 and 642
0
0
1,440.00
1,440.00
Subdivision Lot 641
0
0
0
1,846.85
Total Assets
$24,803.77
$51,481.76
$57,393.14
$68,088.01
Total Liabilities
0
0
0
0
Net Worth
$24,803.77
$51,481.76
$57,393.14
$68,088.01
Net Worth January 1
24,803.77
51,481.76
57,393.14
Increase in net worth
$26,677.99
$ 5,911.38
$10,694.87
Estimated living expenses
3,000.00
3,000.00
3,000.00
Federal Income Taxes Paid
151.00
166.00
196.07
Total Net Worth increase plus nondeductible ex-
penditures
$29,828.99
$ 9,077.38
$13,890.94
Less: Nontaxable inheritance
15,000.00
0
0
Adjusted Gross Income
$14,828.99
$ 9,077.38
$13,890.94
Adjusted Gross Income per returns
3,730.65
3,069.17
3,658.88
Unreported Income
$11,098.34
$ 6,008.21
$10,232.06
*72 The additional adjusted gross income determined for 1953, 1954, and 1955 amounts to $14,804.55, $13,474.45, and $8,664.83, respectively. These determinations were based on the specific item of income method. Respondent determined that petitioners had received, but failed to report on their returns the following items: Unreported Income
Business
Interest
Capital
Rental
Year
Income
Income
Gain
Income
Total
1953
$14,054.59
$749.96
0
0
$14,804.55
1954
11,379.48
456.74
$1,638.23
0
13,474.45
1955
7,840.32
820.68
0
$3.83
8,664.83
Respondent used the net worth and expenditures method to determine the petitioners' unreported income for 1950, 1951, and 1952 because no adequate and complete records had been furnished by the petitioners for those years; because their suppliers' records were not as complete for those years as they were for 1953-1955; and because many of Max's customers during 1950-1952 could not be contacted by the agents. The respondent used the specific items of income method of reconstructing their income for 1953, 1954, and 1955 because adequate records of suppliers and others were available to the examining agents, and because that method most correctly reflected their correct income. The unreported income *73 for 1953, 1954, and 1955 is substantially corroborated by a schedule made by the respondent based on the increase in net worth plus personal expenditures method for those years. The following assets and liabilities in respondent's net worth schedule for 1949-1952 have been stipulated to be correct by the petitioners: 12/31/49
12/31/50
12/31/51
12/31/52
U.S. Postal Savings Acct. 55504
$ 2,500.00
$ 2,500.00
$ 2,500.00
$ 2,500.00
U.S. Postal Savings Acct. 61039
0
2,500.00
2,500.00
2,500.00
Erie County Savings Bank, Acct. 647754
2,822.00
3,824.49
3,901.55
3,990.06
Erie County Savings, Acct. 727410
0
1,815.22
1,851.80
1,893.80
Liberty Bank Acct. 7006
415.67
2,614.82
5,647.09
786.73
Liberty Bank Cking. Acct. Max
1,145.49
1,200.05
1,206.12
586.37
Manufacturers & Traders Tr. Co. #5528
0
0
0
2,807.75
Marine Tr. Co. Thrift Acct. Max
5,061.46
4,995.34
5,057.99
2,819.29
Marine Tr. Co. Thrift Acct. Mildred
3,040.73
3,071.20
3,109.73
1,023.12
Total Cash in Banks
$14,985.35
$22,521.12
$25,774.28
$18,907.12
Residence, Eggertsville
0
0
$14,071.58
$25,021.42
Land, 3/19/51, Eggertsville
0
0
2,318.98
2,318.98
Rental real estate owned
$ 8,000.00
$ 8,350.00
$ 8,900.00
$ 8,900.00
Less: Reserve for depreciation
(378.00)
(504.00)
(655.67)
(1,031.17)
Business equipment & vehicles
1,673.50
3,246.17
3,246.17
3,246.17
Less: Reserve for depreciation
(414.58)
(319.03)
(889.70)
(1,470.37)
Lots Nos. 640, 642 acquired 4/17/51, Am-
herst
0
0
1,440.00
1,440.00
Lot No. 641, acquired 3/13/52, Amherst
0
0
0
1,846.85
Liabilities
0
0
0
0
Federal income taxes paid
0
$ 151.00
$ 166.00
$ 196.07
Nontaxable inheritance
0
$15,000.00
0
0
*74 The only items in respondent's net worth-plus-expenditures schedule for 1949-1952, supra, with which petitioners do not agree are as follows: savings bonds in the amount of $3,187.50 in 1950, 1951, and 1952; and living expenses of $3,000 in each year. Petitioners claim that they had a hoard of cash, not in banks, of $23,200 at the end of 1949; that the savings bonds purchased with their own funds were in a smaller total amount than respondent determined; that their living expenses were in a smaller amount in each year; and that their furniture and belongings in their home at the end of 1949 and 1950 cost $5,000, which respondent did not include in the net worth schedule. In 1950, the petitioners and their 2 children went to Italy. They were there about 3 months. They traveled by ship, tourist class. The cost of the round-trip passage for petitioners and the children was about $1,350. They lived with relatives, not in hotels, while in Italy. The parties have stipulated that during 1952 the petitioners paid $5,721.51 to a store in Buffalo for furniture for their home. Respondent included that item in his net worth schedule. Prior to 1948, Max's earnings were only $1.60 an hour, and *75 before his marriage he earned less. Mildred's earnings during World War II were only $1.10 an hour. Their two children were born in 1940, and 1945. The business which Mildred attempted to operate during 1946 was a financial failure. The respondent's records of Assessments and Payments of taxes for the years 1941 through 1955 show that very small amounts of taxes were paid prior to 1950, and that refunds were made in the years 1944-1947. It is stipulated that the petitioners received an inheritance of $15,000 in 1950, in Italy, which they brought back to the United States. Respondent included this amount in his net worth statement for 1949-1952, as nontaxable income. Ultimate Findings, A; Taxable Years 1950-1952 1. The petitioners had cash on hand, not in banks, in the amount of $5,000, at the end of 1949; $18,333, including the inheritance of $15,000, at the end of 1950; $1,667 at the end of 1951, and none at the end of 1952. 2. The petitioners had on hand, at the end of 1949, 1950, 1951, and 1952, United States Savings Bonds, for which they paid the cost out of their own funds, which had a cost of $937.50, $2,437.50, $2,437.50, and $2,437.50, respectively. 3. The petitioners had *76 furniture, at the end of each of the years 1949 through 1951, which cost $5,000. They bought furniture in 1952 at a cost of $5,721.51, and the furniture on hand at the end of 1952 had a total cost of $10,721.51. 4. The cash expenditures of the petitioners for living and personal expenses amounted to the following: $2,800 in 1950; $2,000 in 1951; and $2,200 in 1952. 5. The corrected statement, as made by this Court, of the petitioners' net worth at the end of each year, 1949-1952; of their increases in net worth plus personal expenditures through 1952; and of their unreported income for the years 1950, 1951, and 1952, is set forth hereinafter. The petitioners' realized, but failed to report, taxable income as follows: $8,481.34 for 1950; $3,342.21 for 1951; and $7,765.06 for 1952, as shown in the following corrected net worth statement: Adjusted Net Worth Increases Plus Expenditures
1949
1950
1951
1952
Cash on hand not in banks
$ 5,000.00
$18,333.00
$ 1,667.00
0
Cash in banks
14,985.35
22,521.12
25,774.28
$18,907.12
U.S. Savings Bonds
937.50
2,437.50
2,437.50
2,437.50
Personal residence
0
0
14,071.58
25,021.42
Furniture
5,000.00
5,000.00
5,000.00
10,721.51
Land - residence
0
0
2,318.98
2,318.98
Rental real estate
8,000.00
8,350.00
8,900.00
8,900.00
Less: Reserve for depreciation
(378.00)
(504.00)
(655.67)
(1,031.17)
Business equipment
1,673.50
3,246.17
3,246.17
3,246.17
Less: Reserve for depreciation
(414.58)
(319.03)
(889.70)
(1,470.37)
Subdivision Lots 640 and 642
0
0
1,440.00
1,440.00
Subdivision Lot 641
0
0
0
1,846.85
Total Assets
$34,803.77
$59,064.76
$63,310.14
$72,338.01
Total Liabilities
0
0
0
0
Net Worth
$34,803.77
$59,064.76
$63,310.14
$72,338.01
Net Worth January 1
34,803.77
59,064.76
63,310.14
Increase in net worth
$24,260.99
$ 4,245.38
$ 9,027.87
Estimated living expenses
2,800.00
2,000.00
2,200.00
Federal Income Taxes paid
151.00
166.00
196.07
Total net worth increase plus nondeductible
expenses
$27,211.99
$ 6,411.38
$11,423.94
Less: Nontaxable inheritance
15,000.00
0
0
Adjusted Gross Income as corrected
$12,211.99
$ 6,411.38
$11,423.94
Adjusted Gross Income per returns
3,730.65
3,069.17
3,658.88
Understatement of Adjusted Gross Income
$ 8,481.34
$ 3,342.21
$ 7,765.06
*77 1953, 1954, and 1955 The general investigation procedures of agent Widzinski have been set forth above, but are restated here, for clarity, because respondent made his determinations for the years 1953, 1954, and 1955 by using the specific items method. The business records of the firms who sold ready-mixed concrete and materials to Max for the jobs done in his business, the "suppliers", constitute a "record" of the business of the Casciani Concrete Construction firm during the years 1953, 1954, and 1955, and are evidence of the sales of materials used at the jobs. The suppliers delivered the materials to the addresses of the customers of Max. The business records of the suppliers included the names and addresses of the customers of Max. The respondent's agents actually interviewed, personally, a large percentage of those customers. Those individuals, who were interviewed, provided the agents with information about the amount each one had paid Max Casciani's firm for a particular job which had been contracted. The investigation was made, and Max's customers were interviewed by the agents, in 1957. On the basis of these personal interviews and the examination of written items in the *78 possession of customers, such as the cancelled checks of the customers and their receipts for their payments, in cash or by check, to Max, the respondent determined that the total amount of the gross income of the Casciani business was $46,631.59, in 1953; $40,670.05, in 1954; and $41,374.35 in 1955. In preparation for the trial of this case, the petitioners and the respondent entered into lengthy, detailed stipulations, consisting of 24 typed pages, in which there are listed according to years (1953, 1954, and 1955) the names and addresses of Max's customers, the amount paid to Max by each one, the date of each payment, and the method of each payment, either by check or by cash. These stipulations are paragraphs 16 through 21 of the original stipulation of facts; and paragraphs 24 through 26 of the supplemental stipulation of facts. All of those stipulations are incorporated herein by this reference. The petitioners, by entering into those stipulations of facts, admitted that the Casciani business (Max) had received gross income in each year, 1953-1955, in the total sum shown by the stipulations. Thereby, they admitted, also, that in the tax return for each year, 1953-1955, the gross *79 amount of business income had been understated and underreported by a substantial sum for each year. The stipulations described above, however, did not include all of the customers of Max during 1953-1955, and the respondent called upon 8 individuals to testify at the trial of this case, or to produce evidence of payments to Max. With respect to the expenses of the business in each year, for materials, labor, and other expenses including commissions paid by Max to others for assisting him in getting new business, the respondent's agents, in auditing the returns filed for the years involved, accepted as correct some of the business expenses reported on each return, as follows: Respondent accepted the reported labor costs as correct and allowed them as deductions for each year; he accepted as correct most of the "other expenses" of the business but he determined and allowed additional amounts as other expenses for 1953 ($517.57 more); for 1954 ($384.92 more); and he reduced by $34.01 the other expenses for 1955. The costs of materials constituted the larger part of business expenses each year. Respondent's agents ascertained from the business records of the suppliers the actual, total *80 cost of materials purchased by Max in each year. Petitioners have stipulated with respondent, without conceding a fraudulent intent, the total cost of materials for each year, as follows: $20,138.93, in 1953; $16,027.76, in 1954; and $16,838.81 in 1955. These amounts are more than twice the amount of the cost of materials reported in each tax return for these years, as has been shown herein, before. The petitioners, therefore, have admitted that they substantially understated in each tax return the expense of materials used in the business in each year. The costs each year of materials, stipulated by the parties, are the same total amount for each year that agent Widzinski ascertained in his investigation. The respondent determined that the petitioners received in each year other income (apart from the income of the concrete business), consisting of interest each year on bank deposits in 12 savings accounts, mortgage interest, and taxable long-term capital gain in 1954 from the sale of 3 lots which they did not report in their tax returns. Without conceding a fraudulent intent, the petitioners have stipulated with the respondent the annual amounts of the unreported interest income, *81 and of the capital gain in 1954, and thereby they have admitted that they failed to report such income. The stipulated, unreported, interest income was $749.96 in 1953; $456.74 in 1954; and $820.68 in 1955. The unreported long-term capital gain in 1954 was $3,276.47, of which 50 percent, $1,638.23, is taxable income. The above amounts are the same as respondent's agents ascertained through their investigation, and as determined by the respondent in the notice of deficiency. In addition, the respondent determined that petitioners failed to report in their 1955 tax return $3.83, rental income. The petitioners did not agree to this item in any stipulation. The petitioners did not attempt to prove at the trial that this determination was incorrect. There has been set forth herein before a schedule containing all of the above items of unreported income. The following schedules set forth respondent's reconstruction of petitioners' taxable income for the years 1953-1955 on the basis of the specific items method, and they represent respondent's determinations in the deficiency notice: 1953, Taxable Income Per Respondent Corrected business income: Gross receipts
$46,631.59
All expenses
29,714.46
Net business income
$16,917.13
Less reported business income
2,862.54
Unreported business income
$14,054.59
Interest
749.96
Total unreported income
$14,804.55
*82 1954, Taxable Income Per Respondent Corrected business income: Gross receipts
$40,670.05
All expenses
26,329.61
Net business income
$14,340.44
Less reported business income
2,960.96
Unreported business income
$11,379.48
Interest
456.74
Capital gain
1,638.23
Total unreported income
$13,474.45
1955, Taxable Income Per Respondent Corrected business income: Gross receipts
$41,374.35
All expenses
27,084.69
Net business income
$14,289.66
Less reported business income
6,449.34
Unreported business income
$ 7,840.32
Interest
820.68
Rent
3.83
Total unreported income
$ 8,664.83
The petitioners understated in their returns the main expense of the Casciani concrete business, costs of materials. The following schedules cover the details: Costs of Materials
Resp.'s Deter-
mination and
Per
Under-
Stipulations
Returns
statement
1953
$20,138.93
$ 6,378.92
$13,760.01
1954
16,027.76
6,924.79
9,102.97
1955
16,838.81
8,413.35
8,425.46
All Business Expenses
1953
$29,714.46
$15,436.88
$14,277.58
1954
26,329.61
16,841.69
9,487.92
1955
27,084.69
18,693.24
8,391.45 For the 3 years, petitioners reported as the gross receipts of the business a total sum of $63,244.63; respondent determined (in both the investigation and deficiency notices) gross receipts of the business of *83 $128,675.99; and according to respondent's determinations the petitioners failed to report in their returns total gross receipts of $65,431.36: Resp.'s Deter-
Per
Not
minations
Returns
Reported
1953
$ 46,631.59
$18,299.42
$28,332.17
1954
40,670.05
19,802.63
20,867.42
1955
41,374.35
25,142.58
18,231.77
Total
$128,675.99
$63,244.63
$65,431.36
For the 3 years, the petitioners, on their returns, reported as the net, taxable, business income the total sum of $12,272.84; the respondent determined such amount to be $45,547.23, and that petitioners understated such net income by the total sum of $33,274.39: Net Business Income
Resp.'s Deter-
Per
Not
minations
Returns
Reported
1953
$16,917.13
$ 2,862.54
$14,054.59
1954
14,340.44
2,960.96
11,379.48
1955
14,289.66
6,449.34
7,840.32
Totals
$45,547.23
$12,272.84
$33,274.39
Before the trial, the respondent undertook to obtain stipulations of the petitioners about the correct amount of the gross receipts of the business in each year. As stated above, petitioners (without conceding an intent to file false returns) agreed with the respondent that most of his determinations of the amounts of the gross, business receipts were correct, but petitioners would not agree to the full amount determined *84 for each year. At the trial, respondent then proved that petitioners received additional amounts of gross receipts in each year, in addition to the stipulation. However, between the time of respondent's investigation in 1957 and the subsequent trial of this case, some of the customers of Max, whom the agents had interviewed in 1957, had died or become unavailable for their personal confirmation at the trial of the amounts they had paid Max, the information they had given the agents in 1957. Therefore, at the trial respondent could not confirm a part of his determination of the amount of the gross receipts for 1953 and 1954. He could not at the trial confirm $88 of the receipts he had determined for 1953, and $766.99 of the amount determined for 1954; but he confirmed 100 percent of the amount he had determined as gross receipts for 1955, plus an additional $143.50, for which additional amount he has not claimed an increase in the deficiency for 1955. The following schedule shows the above details: Gross Receipts of Business
1.
2.
3.
4.
5. Additional
Total
Determined
Stipulated
At Trial
At Trial
Difference * *85 1953
$ 46,631.59
$ 44,022.47
$2,521.12
$ 46,543.59
$ (88.00)
1954
40,670.05
39,233.06
670.00
39,903.06
(766.99)
1955
41,374.35
41,130.85
387.00
41,517.85
143.50
$128,675.99
$124,386.38
$3,578.12
$127,964.50
[711.49)
The gross receipts of the concrete business for the years 1953-1955 amounted to $46,543.59 for 1953; $39,903.06 for 1954; and $41,374.35 for 1955 (as determined by respondent in the deficiency notice since respondent has not made a claim for an increased deficiency for 1955). On the basis of the above amounts of gross business receipts, the unreported net income from the business was $13,966.59 for 1953; $10,612.49 for 1954; and $7,840.32 for 1955 (as shown in a prior schedule, supra). The total amount of petitioners' unreported income for each year was $14,716.55 for 1953; $12,707.46 for 1954; and $8,664.83 for 1955 (as shown in a prior schedule, supra). The following schedule shows the Court's determinations of the above amounts of total unreported income for *86 1953 and 1954: 1953, Taxable Income Determined.
Corrected business income: Gross receipts
$46,543.59
All expenses
29,714.46
Net business income
$16,829.13
Less reported business income
2,862.54
Unreported business income
$13,966.59
Interest
749.96
Total unreported income
$14,716.55
1954, Taxable Income Determined.
Corrected business income: Gross receipts
$39,903.06
All expenses
26,329.61
Net business income
$13,573.45
Less reported business income
2,960.96
Unreported business income
$10,612.49
Interest and capital gain
2,094.97
Total unreported income
$12,707.46 Section 294(d)(2), 1939 Code, for 1952, 1953, and 1954: On the basis of the facts shown on the petitioners' returns filed for each preceding year, i.e., 1951, for the 1952 return; 1952, for the 1953 return; and 1953, for the 1954 return, the petitioners filed timely a declaration of estimated tax for 1952, for 1953, and for 1954. The petitioners made timely payments of the estimated tax for 1952, 1953, and 1954 in an amount equal to or greater than the tax shown on the tax return for the preceding year, in each instance. The petitioners are not liable for an addition to tax under section 294(d)(2), 1939 Code, for 1952, 1953, and 1954. Section 294(d)(1)(A), *87 1939 Code, for 1950 and 1951: Petitioners failed to file a declaration of estimated tax for 1950 and 1951. The petitioners failed to prove that they were not required to file a declaration of estimated tax for 1950 and 1951 under the provisions of section 58, 1939 Code. The petitioners' tax returns for 1950 and 1951 were not filed on or before January 15, 1951, and January 15, 1952, respectively; the provisions of section 58(d)(3) do not apply; and the returns filed for 1950 and 1951 cannot be treated as the declarations of estimated tax for 1950 and 1951. The petitioners are liable for the addition to tax for 1950 and 1951 under section 294(d)(1)(A). Ultimate Findings, B, 1953, 1954, and 1955; 1950-1952 1. The petitioners filed false and fraudulent returns with intent to evade taxes for each of the years 1950-1955, inclusive. Therefore, the assessment and collection of the tax for each of those years are not barred by the statute of limitations; section 276(a), 1939 Code, and section 6501(c), 1954 Code. 2. The petitioners realized but failed to report taxable income for each of the years 1953, 1954, and 1955 in the following respective amounts: $14,716.55 for 1953; $12,707.46 for *88 1954; and $8,664.83 for 1955. 3. At least part of the deficiency for each of the 6 years 1950 through 1955 was due to fraud with intent to evade tax. Therefore the petitioners are liable for an addition of 50 percent of the deficiency for each of the 6 years 1950 through 1955, under section 293(b), 1939 Code, and section 6653(b), 1954 Code. Opinion One issue is whether there is a bar of the statute of limitations to the assessment and collection of tax deficiencies for any or each of the 6 years, 1950 through 1955. That bar does not apply if a false or fraudulent return with intent to evade tax was filed for any or each of the years. Section 276(a), 1939 Code (which applies to 1950-1953), and section 6501(c)(1) 1954 Code (which applies to 1954 and 1955). Respondent had the burden of proving fraud, by clear and convincing evidence, for the purpose of the above sections of the Codes, as well as for the purpose of section 293(b), 1939 Code, and section 6653(b), 1954 Code. See Rule 32 of this Court's Rules of Practice; section 1112, 1939 Code; section 7454(a), 1954 Code; Arlette Coat Co., 14 T.C. 751; Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960), affirming a Memorandum Opinion *89 of this Court; Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962), affirming a Memorandum Opinion of this Court; and Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming on this point and modifying a Memorandum Opinion of this Court. Related to the above issue is the question whether the petitioners, for any or each of the years involved, realized but failed to report income, and, if so, whether they filed a false or fraudulent return with intent to evade tax and, therefore, are liable for a 50 percent addition to a deficiency under sections 293(b) and 6653(b) of the 1939 and 1954 Codes, respectively. The findings dispose of both of the above general issues in respondent's favor. With respect to the year 1954, there is the additional factor of collateral estoppel on the issue of fraud derived from the criminal conviction of Max and Mildred for willfully and knowingly attempting to evade and defeat a large part of their income taxes for 1954, in violation of section 7201, 1954 Code. See Arctic Ice Cream Co., 43 T.C. 68, 74, 75; John W. Amos, 43 T.C. 50, affirmed 360 F. 2d 358 (C.A. 4, 1965); Moore v. United States, 360 F. 2d 353 (C.A. 4, 1966); Tomlinson v. Lefkowitz, 334 F. 2d 262 *90 (C.A. 5, 1964), cert. denied 379 U.S. 962. It has been established that a conviction for filing a false and fraudulent tax return for the purpose of evading income tax, even though based on a plea of guilty, makes effective the doctrine of collateral estoppel as to the fraud there involved. Max and Mildred, each, pleaded guilty to the charge of having willfully and knowingly attempted to evade and defeat a large part of the income tax due for 1954 by filing a false and fraudulent joint return for 1954, with intent to evade tax. The same omissions of income from the 1954 return are involved here. Both petitioners were found guilty, were fined, and were given suspended sentences. This sustains respondent's burden of proof as to fraud for 1954. See John W. Amos, supra, and the related cases cited. However, with respect to 1954, the respondent introduced ample and sufficient evidence to prove fraud for 1954 without applying the doctrine of collateral estoppel. The petitioners had the burden of proving errors in the determinations of the amounts of the deficiencies despite the burden upon the respondent to prove fraud to prevent the bar of the statute of limitations. Jacob D. Farber, 43 T.C. 407, 428; *91 Max Cohen, 9 T.C. 1156, 1163, aff'd 176 F. 2d 394. For the most part, petitioners failed to carry their burden of proof with respect to each year. We turn now to discussion of all of the evidence and conclusions based thereon. The respondent determined that the petitioners received taxable income in the 3 years 1950, 1951, and 1952, which was substantially in excess of the income reported for those years, by using the increase in net worth and expenditures formula. He used that method of reconstructing petitioners' taxable income because of the lack of sufficient and adequate records of the petitioners, and because the suppliers' records of the materials sold to Max in his business were not complete for those years, and many of the customers of Max during those years could not be contacted when his investigation was conducted. Respondent's determinations of additional, taxable income for the last 3 years, 1953, 1954, and 1955 were made and based upon, at all times, the specific items method of determining taxable income. The respondent may, and often does, reconstruct the taxable income of a taxpayer for each year in a series of several years by the use of one method for some of *92 the years, and the use of another method for the other years, depending upon the particular facts and circumstances. See 2 Mertens, Law of Federal Income Taxation, Ch. 47, sec. 12.12, p. 47. See also, Blatchford v. Commissioner, 337 F. 2d 1010 (C.A. 6, 1964), affirming this Court's Memorandum Opinion, 1963-83, where the respondent applied one method of reconstruction of income for one series of years, and another method for another series of years. The record here does not show that it was not justified or was not proper for respondent to employ the two different methods in making his respective determinations. Respondent's determinations for 1953-1955 were based upon the specific items method; they were not based upon a preliminary net worth statement of respondent's agent for the years 1953-1955, which was used as a "test". There is no merit in petitioners' argument that respondent erred in not using the net worth and expenditures method in making his final determinations for 1953-1955. The respondent introduced clear, convincing, and overwhelming proof that for each of the 6 years, 1950 through 1955, the petitioners realized but failed to report on each year's return a substantial *93 amount of income. For the 6 years, they reported an aggregate amount of adjusted gross income of $24,409.54, as follows: $3,730.65 for 1950; $3,069.17 for 1951; $3,658.88 for 1952; $3,261.12 for 1953; $3,647.80 for 1954; and $7,041.92 for 1955. The respondent has proved and this Court has found that for the 6 years, petitioners' total taxable income and their unreported income were as follows: Taxable
Unreported
Year
Income *
Income
1950
$12,211.99
$ 8,481.34
1951
6,411.38
3,342.21
1952
11,423.94
7,765.06
1953
17,977.67
14,716.55
1954
16,355.26
12,707.46
1955
15,706.75
8,664.83
$80,086.99 *
$55,677.45
Direct proof of a fraudulent intent to evade taxes is seldom possible. Usually such intent must be gleaned from particular transactions and the entire pattern of a taxpayer's conduct in reporting income and in failing to do so. M. Rea Gano, 19 B.T.A. 518. It has been held in many cases that known discrepancies between actual income and reported income for a period of several years constitute sufficiently clear and convincing evidence of a fraudulent intent to evade taxes. Kurnick v. Commissioner, 232 F. 2d 678, 681 (C.A. 6, 1956); Schwarzkopf v. Commisisoner, supra; *94 Holland v. United States, 348 U.S. 121, 139. In Schwarzkopf, supra, the court observed (p. 734) that "the consistent failure to report substantial amounts of income over a period of years, standing alone, is effective evidence of fraudulent intent". The taxpayers here failed to report, over a period of 6 years, income in the amount of $55,677.45. The failure of petitioners to report a substantial amount of income for each of the 6 taxable years does not stand alone in this case. We are convinced, upon the evidence, that Mildred kept 2 sets of bookkeeping records for all of the taxable years of the Casciani Concrete Construction business; (1) accurate records of the receipts and expenses of the business, which were destroyed after Max was notified that their tax return for 1954 was being examined by revenue agents; and (2) false records of the receipts and expenses of the business which corresponded with what was reported in each tax return. In Nathan Goldsmith, 31 T.C. 56, 64, this Court stated that "the destruction of all records relating to the unrecorded sales is strong and persuasive [evidence of a fraudulent intent to evade taxes]". In Masters v. Commissioner, 243 F. 2d 335, 337, *95 the court said: "There is hardly a more routine badge of income tax fraud than a double set of records". Additional proof of intent to not report large amounts of business income is found in petitioners' failure to deduct the large amounts of purchases of ready-mixed concrete and materials, in at least 1953, 1954, and 1955. The failure to claim deductions in a return is indicative of a taxpayer's scheme to cover up his unreported income so that on its face the tax return will not arouse suspicion. Clark v. United States, 211 F. 2d 100, 103, cert. denied 348 U.S. 911. Respondent's agents were successful in finding out, from the suppliers, large amounts of business expenses which had not been reported and deducted in the returns for the years 1953-1955. The same sources revealed large amounts of business income that was received by the petitioners in the same years. With respect to unreported interest income, Max falsely stated during the investigation that he and his family had only 3 savings accounts, whereas they had at least 9 separate savings accounts in 4 different banks, and 2 postal savings accounts. Attempts by taxpayers to deceive and thereby impede the investigation of *96 tax returns are "cogent evidence of fraud." Jacob D. Farber, supra, p. 420. On the other hand, Max and Mildred, each, admitted during the investigation of the 1954 return that they knew that their income was more than had been reported. Upon the entire record, we are fully convinced that the petitioners, willfully and with fraudulent intent to evade taxes, filed false and fraudulent tax returns for each of the years 1950 through 1955. It is concluded that respondent sustained his burden of proof in that respect, as well as with respect to the deficiency for each year. We are fully convinced that at least part of the deficiency for each year, 1950 through 1955, was due to fraud with intent to evade tax. We are also satisfied that both Max and Mildred had a fraudulent intent to evade tax and to file a false and fraudulent return for each year. The assessment and collection of the deficiencies are not barred for any of the taxable years by the statute of limitations. Since at least part of the deficiency for each year was due to a fraudulent intent to evade tax, the imposition of the penalty of 50 percent of the deficiency for each year is sustained. Consideration has been given to the *97 contentions of the petitioners to the effect that although they failed to report all of their taxable income for each year, their failures were due to extenuating circumstances rather than to a fraudulent intent to evade taxes, but we cannot accept as true petitioners' protestations of a lack of fraudulent intent to evade taxes. Isolated instances of discrepancies or occasional lapses from the rigid accountability required by the law might conceivably be overlooked; but where the whole fabric of a taxpayer's tax accounting is permeated with gross error, where artifice is employed, and where the evidence establishes a consistent pattern of underreporting income and, also, business expenses, and where all tend to accomplish a reduction in apparent tax liability, the situation goes far beyond mere fortuitous and unintentional error. M. Rea Gano, supra, p. 533. The evidence in this case is clear and convincing that the petitioners had the intent of fraudulently failing to report all of their taxable income, and of filing a false and fraudulent return for each year. See Nathan Goldsmith, supra; Clark v. United States, supra; and Schwarzkopf v. Commissioner, supra. The petitioners' *98 chief attack on respondent's reconstruction of taxable income, under the net worth and expenditures schedule, for the years 1950, 1951, and 1952, consists of their claim that at the end of 1949, they had a hoard of cash, not deposited in banks, of $23,200; that their cash expenditures for living and personal expenses were less than respondent determined; and that other adjustments should have been made in their favor in the net worth schedule for the period 1949 through 1952. All of these claims of petitioners have been carefully considered. On the basis of the record here, we have made a few adjustments in petitioners' favor and have revised to some extent the respondent's net worth schedule, as has been set forth in the findings. We have found that petitioners had some undeposited cash on hand, namely, $5,000 at the end of 1949; $3,333 at the end of 1950, in addition to the legacy of $15,000; and $1,667 at the end of 1951. We have found that the expenditures for living expenses in each year, 1950-1952, were less than respondent determined; and we have found that at the end of 1949 and each year thereafter petitioners had furniture at the cost of $5,000. But we are unable to find *99 that petitioners had a hoard of cash at the end of 1949 in excess of $5,000, and as large as $23,200. Their story about and their claim that a cash hoard in the latter amount existed at the end of 1949 is not corroborated, is based on unsubstantiated, self-serving testimony, and is incredible and unworthy of belief. Petitioners offered almost no proof with respect to the deficiencies for 1953, 1954, and 1955. In fact, they entered into stipulations with the respondent agreeing to his determinations of amounts of unreported interest, capital gain, and almost all of the gross receipts of the business, and the cost of most of the materials purchased for the business. Petitioners have made claims for allowances of some additional business expenses, but they were not able to prove that such additional expenditures were made in each year, in the business, or the dollar amounts thereof. Therefore, it cannot be found as a fact that such additional business expenses were incurred and paid in each of the years 1953, 1954, and 1955. There is, however, one factor which is favorable to the petitioners. At the trial of this case, the respondent undertook to substantiate his determinations in the *100 deficiency notice of the amounts of the gross business receipts in each year, but he was unable to do so entirely. His evidence about the gross business receipts was less than he determined in the notice of deficiency to the extent of $88 for 1953, and $766.99 for 1954. Our findings, therefore, are that the gross business receipts were $46,543.59 for 1953, and $39,903.06 for 1954. Those findings are favorable to the petitioners. Upon the entire record, further adjustments in petitioners' favor are not justified and must be disallowed because of petitioners' failure of proof in regard to the respective amount of each deficiency. Further discussion of the Court's findings and conclusions is unnecessary because of the detailed and self-explanatory findings. The Court's determinations of the amount of the unreported income for each year, 1950-1955, inclusive, are set forth in the schedule above. Those amounts are less than the respondent determined for the years 1950-1952, inclusive, and for 1953 and 1954, but are the same for 1955. Section 294(d)(1)(A), 1939 Code, provides for an addition to the tax for failure to file a declaration of estimated tax within the time prescribed, unless *101 such failure is due to reasonable cause and not to willful neglect. The petitioners failed to file declarations of estimated tax for 1950 and 1951. They have not established that their failure was due to reasonable cause and was not due to willful neglect. They had the burden of proving that the imposition of this penalty was erroneous. They failed to meet their burden of proof. See Andre Picard, 28 T.C. 955, 960; Howard M. Fischer, 25 T.C. 102, 104; and sections 58(a) and 58(d)(3), 1939 Code. The return for 1950, dated February 15, 1951, was received in the collector's office on February 28, 1951. The 1951 return, dated February 18, 1952, was received by the collector on March 10, 1952. In the 1950 return, net income from the concrete business was reported to be $3,058.17, and income from other sources, rents, $672.48. In the 1951 return there were reported net business income of $2,625.60 and income from rents, $443.57. The 1950 return and 1951 return, each, was filed too late to constitute in itself a declaration of estimated tax under section 58(d)(3). Section 58(a)(2) requires an individual to file a declaration of estimated tax "if his gross income from sources other than wages *102 * * * can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more." With respect to 1950 and 1951, the evidence shows that during 1950 and at least the two preceding years Max was actively engaged in the operation of a business for profit. The petitioners failed to prove that under the provisions of section 58(a) they were not required to file a declaration for 1950 and 1951. The petitioners are liable for an addition to the tax for 1950 and 1951 under section 294(d)(1)(A). The amounts thereof will be recomputed under Rule 50. The respondent determined additions to the tax, under section 294(d)(2), for 3 years, 1952, 1953, and 1954. The provisions of section 294(d)(2) impose a penalty for a substantial underestimation of estimated tax, but the section provides an exception from the penalty for those years in which there has been a timely payment of estimated tax in an amount at least as great as it was "on the basis of the facts shown on his return for the preceding taxable year." Petitioners made timely payments of estimated tax as follows:$82 for 1952; $201.00 for 1953; and $104.59 for 1954. Each of the payments was in an amount as great, *103 or greater, as though computed on the basis of the facts shown on the return for each preceding taxable year, 1951, 1952, and 1953. The respondent, in the deficiency notice, credited the petitioners with the payment of estimated tax of $82 for 1952, $201 for 1953, and $104.59 for 1954. In Schwarzkopf, supra, p. 734, the court interpreted the pertinent statutory provision to mean that no penalty for underestimation of tax may be imposed where the payment was based on the preceding year's return even though that return was fraudulent. See Herbert Schellenbarg, 31 T.C. 1269, 1279, reversed on other grounds 283 F. 2d 871; and 8A Mertens, Law of Federal Income Taxation, Ch. 47A, sec. 47A. 29, p. 148. If the Congress had intended, for purposes of section 294(d)(2), to compare the estimated tax with the tax based on reconstructed or unreported income, it would have provided to that effect, but it did not do so. It is concluded, therefore, that the addition to the tax for 1952, 1953, and 1954, under section 294(d)(2), was erroneously determined by the respondent. Those penalties are not sustained. Decision will be entered under Rule 50. Footnotes
*. Column 4 is the total of columns 2 and 3. Column 5 is the difference between columns 1 and 4. In column 4, for 1955, $41,517.85 is $143.50 more for 1955 than respondent determined, $41,374.35. For the 3 years, respondent at the trial established the gross receipts were $127,964.50, which is $711.49, net, less than he had determined, $128,675.99. Figures in parenthesis mean less than determined by respondent in the deficiency notice.
*. Includes rents which petitioners reported.↩